OPINION OF THE COURT
Kaye, J.
This appeal in a highly publicized murder case centers on the tension between the constitutional right of an accused to a fair trial and the constitutional right of the public and the press to attend the proceedings. While defendant insists that an open courtroom during a Huntley hearing will imperil his right to secure an impartial jury, we conclude — as did the Appellate Division — that closure was improper here because of the absence of the requisite factual and legal predicates.
Defendant, Robert Chambers, is charged with the murder of a young woman, Jennifer Levin, in Central Park during the early morning hours of August 26, 1986. A combination of violence, youth, sex and privilege, the case has already attracted extensive public attention.
On May 7, 1987 — the eve of the Huntley hearing — defendant moved that the courtroom be closed to the public and the press, on the ground that disclosure of any suppressed statement would threaten the later impaneling of an impartial jury, and thus deny him his constitutional right to a fair trial. Instead, defendant proposed that, after a jury was sworn, the *36 media be furnished with transcripts of the hearing, redacted to exclude any suppressed statements. The only particular statements referred to by defense counsel in his argument for closure consisted of a lengthy videotaped interview given by defendant shortly after the crime, to an Assistant District Attorney and a police officer. Counsel represented, without any specificity, that "[m]any of the details of what is in there have never been reported to the press,” and that "there is, therefore, much information and much detail that has not come out at all.”
The People have consistently urged that the hearing be open, contending that in substance defendant’s statements have already been fully disclosed to the public. In opposing closure of the suppression hearing, which involves challenges to police and prosecutorial conduct, the prosecutor argued additionally that the public had a right to know about the events leading up to defendant’s arrest.
In its decision announced the morning of May 8, 1987, the trial court, quoting extensively from Matter of Gannett Co. v De Pasquale (43 NY2d 370, affd 443 US 368), granted defendant’s request, concluding: "the court feels in view of the strong language of the Gannett case that I read and re-read, that it reluctantly and with great emotion, frankly, must exclude the press from this portion, that is, the Huntley portion of the hearing.” The court noted that — while it did not know what tainted evidence (if any) there might be and it did not know whether disclosure of potentially suppressible evidence would impede obtaining an impartial jury — it could not "gamble with the possibility of tainted evidence being printed, and the possibility of our having to call another three hundred members of a panel before we are able to select twelve Constitutionally fair jurors.” The court observed that much of the publicity in the case had its source in defendant’s own filings. However, it made no specific findings regarding the existence of any additional, nonpublic statements, or the presence of prejudice that closure would prevent, or alternatives to closure.
The media petitioners that very day commenced the present article 78 proceeding against the Trial Judge and defendant, to enjoin the court from going forward with closed pretrial proceedings. On May 13, 1987, the Appellate Division granted their petition and vacated the closure order. In concluding that defendant failed in his burden to establish justification *37 for denying access, the court noted that defendant had "made detailed statements to the public and press disclosing most, if not all, of the information he now seeks to keep secret. Indeed, this record discloses that defendant, in his own pretrial motions, has made the matters he now seeks to suppress freely available to the media.”
In a line of cases beginning with Matter of Gannett Co. v De Pasquale (supra), this court and the United States Supreme Court have weighed an accused’s right to a fair trial against demands of the press for access to the courtroom. In Gannett, we upheld a trial court’s closure of a pretrial suppression hearing, recognizing that "[a]t the point where press commentary on those hearings would threaten the impaneling of a constitutionally impartial jury * * * pretrial evidentiary hearings in this State are presumptively to be closed to the public” (43 NY2d, at 380, supra). The Supreme Court affirmed, concluding that under the Sixth Amendment the right to a public trial belongs to the defendant, not the public (443 US, at 390-391, supra).
"[T]he content of constitutional immunities is not constant, but varies from age to age.” (Cardozo, Nature of the Judicial Process, at 82-83.) Just one year after Gannett, the Supreme Court for the first time established that the public and the press have a constitutional right — implicit in the First Amendment — of access to criminal trials (Richmond Newspapers v Virginia, 448 US 555, 580; see also, Globe Newspaper Co. v Superior Ct., 457 US 596, 603; People v Harris, 57 NY2d 335, 347, n 4, cert denied 460 US 1047). As the Supreme Court acknowledged, without a public right of access "important aspects of freedom of speech and 'of the press could be eviscerated’.” (Richmond Newspapers v Virginia, 448 US 555, 580, supra.)
Plainly the First Amendment right of access is not limited to the criminal trial itself. The many policy concerns favoring open proceedings — articulated time and again by the courts (see, e.g., Globe Newspaper Co. v Superior Ct., 457 US 596, 605-606, supra; Richmond Newspapers v Virginia, 448 US 555, 569-572, supra; Gannett Co. v De Pasquale, 443 US 368, 383, supra; Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 437-438) — obviously may pertain equally to other phases of a criminal action. In Press-Enterprise Co. v Superior Ct. (464 US 501 [Press-Enterprise I]), for example, the Supreme Court recognized that this right extends to jury *38 selection, and in Press-Enterprise Co. v Superior Ct. (478 US 1 [Press-Enterprise II]), the court found it applicable as well to preliminary hearings as conducted in California. While the First Amendment right has not yet specifically been applied by the Supreme Court in a case involving a suppression hearing, the court only recently concluded — albeit in a case where defendant opposed closure — that the complementary Sixth Amendment right of the accused to a public trial was applicable to suppression hearings. The court noted that the "need for an open proceeding may be particularly strong with respect to suppression hearings.” (Waller v Georgia, 467 US 39, 47.)
We recognize that suppression hearings pose a peculiar risk in that adverse pretrial publicity could inflame public opinion and taint potential jurors by exposing them to inadmissible but highly prejudicial evidence (Press-Enterprise II, 478 US 1, 14-15, supra; Gannett Co. v De Pasquale, 443 US 368, 378, supra; see also, Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 439, supra; Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 380, supra). By the same token, suppression hearings frequently challenge acts of the police and prosecutor — as indeed appears to be the case here — giving particular value and significance to conducting such hearings in the public eye (see, Waller v Georgia, supra). Taking these considerations into account, it is apparent that a hypothetical risk of prejudice or taint cannot justify categorical denial of public access to suppression hearings because, as a general matter, the important interests of both the accused and the public can be accommodated. In individual cases, through careful voir dire a court can identify any potential jurors whose prior knowledge of the case would deter them from rendering an impartial verdict, and thus protect the right of the accused to a fair trial (Press-Enterprise II, 478 US 1, 14-15, supra). We conclude, therefore, that the public and the press may have a First Amendment right of access to pretrial suppression hearings.
This right of access is not, however, absolute. Although open criminal proceedings in general and open suppression hearings in particular serve to assure fairness and integrity, there are circumstances where the right of the accused to a fair trial might be inhibited or undermined by unrestricted publicity (Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 443-444, supra). Where a defendant’s right to a fair trial is threatened "the trial court must determine whether *39 the situation is such that the rights of the accused override the qualified First Amendment right of access” (Press-Enterprise II, 478 US 1, 9-10, supra).
A defendant who asserts that his right to a fair trial may be compromised by an open proceeding bears the burden of supporting that contention. In order to override the qualified right to access of the public and the press, and close the courtroom, there must be "specific findings * * * demonstrating that first, there is a substantial probability that the defendant’s right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant’s fair trial rights.” (478 US, at 12-13.) No such record had been made here.
While the requirement of "specific findings” cannot be so stringent as to, in effect, divulge that which is sought to be kept confidential, neither defendant in his submission nor the trial court in its findings met the standards required for excluding the public and the press from the courtroom. Defendant himself only hinted at "much information and much detail that has not come out at all”. The trial court acknowledged that it did not know what — if any — tainted evidence there might be, and did not know whether any such evidence would threaten impaneling an impartial jury, but nonetheless closed the hearing on the "possibility” that there might be such evidence and that it might affect jury selection. In this court, defendant submitted the sealed transcript of his videotaped interview, and no other statements; the media petitioners, in support of their contention that the challenged statements have already been made public, submitted portions of a 50-page affidavit filed by defense counsel months earlier in connection with several defense motions. That affidavit summarized and indeed excerpted large segments of the videotape, supporting the conclusion reached by the Appellate Division that the contents of the videotape have in substance already been disclosed. There was no specific finding of a substantial probability that the defendant’s right to a fair trial would be prejudiced by publicity that closure would prevent, and no finding that reasonable alternatives to closure could not adequately protect defendant’s fair trial rights. Indeed, such findings would not have had support in this record, and we therefore reject the request of respondent Bell that the matter simply be remitted for findings.
*40 By denying public access to the suppression hearing on a "possibility” that there might be tainted, nonpublic evidence that might impair the selection of an impartial jury — which could very likely be said of every suppression hearing in every highly publicized case — the trial court improperly closed the door on petitioners’ First Amendment rights.
Accordingly, the judgment of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Judgment affirmed, without costs.